Good morning. May it please the court. My name is Suzanne Lee Elliott. I'm here on behalf of Anthony Pelayo. I would like to reserve two minutes for rebuttal. The government and I agree on the standard of review in this case regarding the warrant that Mr. Pelayo is arguing was overbroad and not particular enough, and that is de novo review. There were no factual findings entered by the judge here, although if there were, of course, the standard of review is more deferential to the trial court. The black letter law here is that to satisfy the Fourth Amendment's particularity requirements, a warrant must specify three things. First, the crimes being investigated. Two, the items that the government believes are related to that probable cause and should be seized. And three, the place where the government is allowed to search for these items. The question in this case, it's one of first impression really, is how do you apply that law to the digital space? Historically, of course, Fourth Amendment law was developed around physical spaces, your home, your car, your person. But in the digital space, it's very different. And this court and other courts have been, I wouldn't say struggling, but as the digital space has changed, they've issued differing opinions. Well, let's say we held in United States v. Henderson that any activating computer sufficiently described the place to be searched. Why is an iCloud account different when both may have different files and apps in the stored data? What's your best case that suggests that any internal subdivision of an iCloud account is a place within the meaning of the Fourth Amendment? I think that's the question of first impression here. There is no, I can find no case issued by any court that talks about the various apps that are aggregated into the iCloud. Now, you have decided cases about Google, which is a little different, and you have decided cases about Facebook, which is different. Facebook's a social media site. There's some argument that what you put up there, you want to be public. You're telling people about what you're doing. Google, I don't know what the protocols there are, but it appears to me from the cases that Google is willing to segregate out e-mails and text messages. And I will concede here the government had probable cause to believe that Mr. Palaio was communicating with Mr. Woodard and Ms. Bronze via e-mails. Counsel, what are you arguing for? Something like a law office search? Well, I believe this court has, although CDT had multiple opinions, I'm arguing for two things. One, I don't think that the U.S. government and the people of the United States should have to accede to Apple's notion that they can't segregate the data. Judges decide what data gets turned over. So the warrant itself should say the Apple e-mail and the Apple text, and if Apple thinks that's too burdensome as a $3 billion company, they can come into court and argue about that. There's no doubt in my mind that they slice and dice data every day because that's what they sell to advertisers. Just to pause you there on Judge Hawkins' question, so you think that within the iCloud the government was required to specify particular applications within that? Yes. One, the one that they had probable cause that my client was using, which is... Well, do you concede there was probable cause to search for evidence of drug trafficking? I concede that there was probable cause to search his e-mail and his texts for evidence of drug trafficking. And other things like photos and other types of applications that could be used to have evidence of this kind of activity? So here there was no information that my client had photos or other evidence in his iCloud. Now, I know that Officer Cheng has a boilerplate. But that goes back to do you concede there was probable cause to search for evidence of drug trafficking? Yes. I think you do. Yes, I do. So, yeah. In a very narrow category of cases. But to get back to Judge Hawkins... But, like, couldn't there be a photo with just, like, piles of drugs and money? So... You could, I mean, you know, we all know in gang cases we see people with their guns and their, you know, whole things, like, in their photos, their monikers. That is correct, Your Honor. And that gets to my second solution that the courts have adopted in these kinds of cases. And what happened here was the case officer got this 82 megs of information and he searched it himself. In Shesso, and I think I'm saying that correctly, and Flores, both of those cases, the segregation of evidence of drug dealing was done by an independent monitor, a TAINT team, or the... I think in Flores it was even Twitter itself. So those two protective measures could allow you to search through the text messages and the phone records. And if, from there, further probable cause is developed, then the TAINT team can provide that. Did your client ask the trial court to employ such measures? No, because he was not available when the warrant... I mean, he was not represented, wasn't appearing before the magistrate. It seems to me that's the point at which... Well, but where did you argue in the district court that there was no probable cause with regard to the firearm and the money laundering offenses? I didn't... I wasn't able to find that. My brief does expand on that in the trial court, but it was... Well, is that another way of saying you didn't argue it in the district court? It was not argued in the district court. I was not district court counsel. But it's pretty clear that if one looks at the probable cause statement, there was no evidence in the text messages of money laundering. And Officer Cheng made the assumption my client was a felon in possession of... or might be a felon in possession of a firearm. There was absolutely no firearm mentioned in the text messages or the emails, and he wasn't even prohibited from owning such a firearm. So what happened... I think what happened here was the officer saw on a list somewhere on email the kinds of things that Apple collected and just took them wholesale and inserted them into his request... his application, and then they were inserted wholesale into the warrant without any regard for... I mean, iTunes? There was no evidence in this case that Mr. Palaio's iTunes were used in... Let's just go back then to what exactly you want, you know, the rule you want. It seems like you want two things. Number one, you want something that's more specific than just iCloud. You want specific applications. And second, you want some additional process. You want some intermediary or some third party or perhaps Apple or maybe a different investigative team to review these materials. Is that fair? That's fair because Rule 41 does provide for this, you know, seize first, search second, but within constitutional limits. And so those are two protective measures which weren't applied here, which could have made a over-seizure... Okay, so what's the best authority you would have to support these kinds of protections? Well, Sessio and Flores talk about over-seizure and the use of teams. CDT does. I can find, again, because the digital world is changing faster than, you know, our creaky old court system can to catch up with these kinds of things. I can't find any case that talks about the various places within the iCloud. But does your argument depend on the premise that the iCloud is just different from other forms of electronically stored information? 100%. Okay. It's like saying Ms. Elliott committed a drug trafficking crime, so we think there's something in her house versus we should be able to search all of Seattle. Would you like to save the balance of your time? I would like to save the balance of my time. Okay, thank you. And let's see if my colleagues have questions. You're welcome. All right, we'll hear from the government. Good morning, Your Honors. May it please the Court. Michael Morgan for the United States. I'd like to take issue with a central premise of counsel's argument, which is that somehow an iCloud account is fundamentally different than other digital media. There's just simply not one. There's nothing in the record to support that. And two, as a practical matter, it's just not. I mean, let's back up a minute and look at this particular case. We're talking about 5 gigabytes of data. 82 gigabytes were produced, but most of that related to other defendants who aren't in the case. Mr. Palaio's account was 5 gigabytes, smaller than the amount of data that's on most people's cell phones today. You're saying you got 82 from Apple, but 5 pertained to Mr. Palaio's account? That's correct, because the warrant sought iCloud accounts for two different individuals. So we're only talking about 5 gigabytes of data. So we're actually talking about a relatively, in the digital space, small universe of data. Secondly, this is less data than would be searched on a traditional computer or cell phone. Why was it necessary for the warrant to include iTunes and iGames in the warrant? Well, iGames actually makes perfect sense, because there are plenty of games that have messaging applications. And that's the point, is like there are apps. So like what I watch on TV, I mean, my law clerks were making fun of me, that terrorist groups on Homeland or whatever like send messages through the games. I think I would – we can talk about gaming culture. I would more align it to something like Call of Duty, where there's actually like chats that go on between the gamers. So there's actually potentially messaging applications within them. So that is a reason for that, that type of information. But again, if we're talking about the particularity requirement, the place to be searched, I mean, the warrant was very particular. It was Mr. Palaio's iCloud account. That is very particular. It's no less particular than, say, Mr. Palaio's iPhone or Mr. Palaio's computer. That is a definite place to be searched. There's – and it's also worth noting that Apple made clear that this file that was produced, this is how Apple stores the data. The defendant cites no authority for the proposition that a third-party private actor is required to alter its software to make it more segregable. There's just no authority for that. And all these points aside, I think the court could ignore all of this because you can just affirm the warrant on good faith. There's – as counsel – I would argue as a last ditch, if we got to it, that the panel could conclude that the good faith exception would apply here, that a reasonably well-trained officer would not have known that the search of the iCloud account was illegal and that the warrant was limited by person, time, location, and specific criminal conduct. And then I think you can make another argument that evidence challenged was irrelevant or duplicative of other evidence, thus any error was harmless. So those are your last arguments. Well, there's even a third, which is that the bulk of the – of what I understand the complaint about the warrant is not really particularity. I mean, I understand they want to make this particular argument vis-a-vis an iCloud versus some other digital media. But the lion's share of the argument is overbreath, is that they think that they were seeking too much information. Well, the short answer to that is that there wasn't a stitch of evidence admitted at trial that was even arguably seized under an overbroad position. So there would really be no suppression remedy here anyway, even if you were to find that some provision of Attachment B, Section 2, was overbroad. So if – because that's the remedy, is if there's an overbroad seizure, you suppress the evidence that's overbroad and the evidence within the scope of the warrant you keep. Well, here all the evidence admitted at trial was within the scope of the warrant. I don't even believe the defense can test that point. The warrant in this case was served on Apple? The warrant in this case was served on Apple. And Apple responded? Apple responded. And the government is comfortable with a private company making that decision? I don't know that it's a decision. It's like we asked them to provide the iCloud account for Mr. Palaio, and Apple provided it. I don't know what else we could have asked them to provide. Did they hold anything back? Excuse me? Did they hold anything back? Not that we're aware of. I mean, we asked for the iCloud account, and we got the iCloud account. I mean, the iCloud account is very simple. It just corresponds to Mr. Palaio's Apple ID and his registration information. So that's what they provided. We're not aware of that. How much of this is now just standard operating procedure that you have routinely sending these requests out to Apple for the iCloud information in criminal cases like this? I wouldn't say that it's routine, but if you have a case where you know, as in this case, that we knew that people were communicating via iPhone applications, it's a prudent investigative tool because people do, as this case shows, tend to back up their data to their iCloud account. So then I think Mr. Palaio wanted to have a hearing and was denied a hearing on that issue, right? And that, I guess, is reviewed for abuse of discretion. But you said, as far as you know, Apple gave you everything. And so why would a hearing have why wasn't a hearing necessary? Well, a hearing wasn't necessary in this case. As I understand, the reason the defense wanted a hearing is because they wanted to explore the search protocols that the agent used when reviewing the produced iCloud account. The reason there was no need for a hearing is because the defense proffered no evidence to even suggest that the agent went beyond the scope of the warrant. So I guess that is the question. Maybe counsel or the appellant could. It doesn't seem that Palaio argued that any of the information used against him was obtained because of one of the overbroad terms. I believe that's accurate. Nor does he assert that the search exceeded the scope of the warrants terms. In fact, most of the evidence produced were text messages, photographs, and some Internet search history. So the protocols that Agent Chang used to search the iCloud account, I guess the argument would be, were not necessary to establish. I think that's right. I mean, it's the defendant's burden if he wants a hearing to at least show that there's something to be resolved. And there needs to at least be some showing that perhaps the agent went beyond the scope of the warrant. And I think that if you actually look at it, it's in the record. It's in our SCRs. The reports of this search show that of the five gigabytes, they only tagged as relevant about half a gigabyte. The search was just like a manual review? Yes. There was not some other kind of protocols imposed on the search in this case? As I understand it, the record is not fully developed as to the precise mechanism by which they searched. I mean, I'm confident that they used it. I mean, just for the photos, for example, is the understanding that they would have reviewed all the photos and put eyes on them and then decided these are the ones that may be indicative of wrongdoing? I would imagine yes, because the way my understanding is, and this is extra record, but my understanding is the way that the forensic software works is it will go through the thing and it will give you your, like, these are the photos on the data. And then you do have to put eyes on it even briefly just to sort of see if it's responsive, not responsive. But that's how any search warrant is executed. Like, if you have documents, you have to physically put eyes on them and say, okay, this is responsive. This is not responsive. There's nothing nefarious or problematic about that type of approach. Do we know with any kind of specificity what the agent screened out? We don't because the record, there was no hearing. So we don't know the precise mechanism that the agent used. But we can draw some inferences, which is that he took, my math is rusty, but he took half a gig of five and a half gigs as being responsive. So the vast majority he was able to rule out as being nonresponsive to the warrant. I mean, that suggests that the agent was, you know. So we're left to rely upon the good faith of the agent involved. And just hypothetically, if there had been a photograph in there of his wife or girlfriend scantily clothed, we have to assume that he put that aside. You would have to assume that, but I think that, in fact, because we have in the record what was, we have the entire extraction from the iCloud. It's in the record. It's in the SCR so you can actually see what was produced. So there are no such photographs. So we know that they were, in fact, screened out of the material that was produced as responsive. The SCR contains what, sorry. I'm sorry. Was that apparent at the time of the request for a hearing? I'm going to say yes with a caveat because I would have to look at the discovery index to see when things were produced. But my understanding is that they wouldn't have moved to suppress the iCloud unless they had, you know, knew the iCloud was searched and had the responsive data. So I'm going to say yes, they knew what was produced. And that's the point is that we saw what was produced. Your answer to my question is you don't know. I mean, I actually could if I could figure it out. Off the top of my head, I'm going to say yes because my understanding of the timeline is that the suppression was after the iCloud was produced to the defense and discovery. It's an educated guess of my memory of the record. And, again, though, there was no showing by the defense or any inkling that the agent went beyond the terms of the warrant. So there was no need for a hearing to explore what is essentially an academic issue. Any additional questions? Just to clarify, what the SCR has is what was deemed responsive. It doesn't include the materials that the agents reviewed that they would have decided this is not relevant to this case? That's correct because what's included in the SCR is what was admitted at trial, which is what we deemed responsive. Of course, in discovery, we produced the entire iCloud to the defense because we can't, you know, know whether or not the defense might think that something in there is exculpatory. So we're not going to, you know, rely on that. But what's in the SCR is what was admitted at trial. And it is what the government deemed was responsive. Unless the court has any other questions? We don't. Thank you for your argument. I'll give you two minutes for rebuttal. Thank you, Your Honor. I would like to clear up this issue about what Agent Chang rummaged through because he was asked about that at trial by the defense. And as to the iCloud data, he testified he reviewed the data. It was quite lengthy. Every message, every email, every photograph needs to be reviewed for relevance. And some of these accounts were quite voluminous. So from a privacy perspective, the agent here looked at everything. That's his testimony at trial under oath. The basic problem with that is he's the investigative agent. There should be a taint team or some sort of procedure by which the agent is not making those determinations. How is that different from a search of a house? Let's assume there's an affidavit that says a C.I. that's reliable has told me that there are weapons or drugs or whatever in the house. Would we require a trial judge to send somebody into the house to make sure that the agents didn't go where they shouldn't? No, but if the agents go to your car and search it and it's not mentioned in the warrant, that's improper. I'm assuming a warrant, I'm looking for weapons. You're looking for weapons. Well, a weapon, you would look in any container that contained a weapon. Any closet? Yes. If you're looking for, I think the one example in one case is if you're looking for a stolen car, you don't get to look in the closet. There is some, of course, rational human approach to that. The problem is the house and that physical container is not, and even in Riley, the United States Supreme Court said, What's the analog for these digital containers in the physical world? And there really isn't a good one. If you're looking for a weapon, you can't take my medical records, but my medical records might be contained in the iCloud. If I have a watch that tells me if my heart is beating or not, it's going to be there stored. And it's not a choice. What I learned from reading the government's information here is you automatically get this backup, and it's automatically done by Apple. So it's difficult for you to protect your own privacy, and so that is why the court, the court that's issuing the warrant, needs to look at Apple as simply as a giant container which contains many different places and specify the places there's probable cause to look. All right. Unless my colleagues have additional questions, you've gone over. Thank you. I would argue that it was this warrant and the procedures used to review it were so obviously invalid that the good faith, it falls under the one of the four exceptions to the good faith. Well, I guess if there's no case out there and you're saying it's a first impression, how would an officer know what's wrong? Well, I think the officer looking at what had happened, what the government looking at what happened in Shisho and Flores and the CDT case would say, you know, at the very least, it shouldn't be the case agent who's reviewing all this information. Okay. Thank you. You're welcome. Thank you. All right. United States of America, that matter or this matter will stand submitted.
judges: HAWKINS, CALLAHAN, BRESS